NOT FOR PUBLICATION
File Name: 08a0165n.06
Filed: March 25, 2008

NO. 07-5410

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

KAREN HUFFAKER,

        Plaintiff-Appellant,

v.

METROPOLITAN LIFE INSURANCE
COMPANY, CAMPBELL SOUP
COMPANY GROUP INSURANCE PLAN,
a part of the Campbell Soup Company
Health and Welfare Benefit Plan (Long
Term Disability Insurance Plan for Eligible
Active Employees); DIRECTOR-BENEFITS
PLANNING, CAMPBELL SOUP COMPANY,
as Plan Administrator for the Campbell Soup
Company Group Insurance Plan,

        Defendants-Appellees.

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF TENNESSEE

_____/

BEFORE: SUHRHEINRICH and ROGERS, Circuit Judges; and BELL, District Judge.[*]

        **SUHRHEINRICH, Circuit Judge.** Plaintiff-Appellant Karen Huffaker ("Huffaker")

appeals from the district court's dismissal of her claim for long-term disability benefits under the

Employee Requirements Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.,

against Defendants-Appellees Metropolitan Life Insurance Company ("MetLife"); Campbell

Soup Company Group Insurance Plan; and the Director-Benefits Planning, Campbell Soup

Company. For the reasons that follow, we **AFFIRM**.

---

[*]The Honorable Robert H. Bell, Chief United States District Judge for the Western
District of Michigan, sitting by designation.

# I. BACKGROUND

Until January of 2004, Huffaker worked for Pepperidge Farms, a subsidiary of the Campbell Soup Company, as a manager of a Pepperidge Farms thrift store. Huffaker was covered under the Campbell Soup Company's Long Term Disability Benefits Plan ("the Plan"), for which MetLife processes benefits claims.

On January 21, 2004, Huffaker applied for short-term disability benefits after fracturing one of her left ribs due to coughing. The Attending Physician Statement submitted in support of her claim noted that she was capable of working eight hours a day, but unable to perform heavy lifting, and could return to work on "full duty with no restrictions" on January 27, 2004. MetLife tentatively approved Huffaker's claim for short-term disability benefits.

On February 24, 2004, Huffaker consulted Dr. Charles Bozeman, a primary care physician, after aggravating her rib injury. Dr. Bozeman prepared an Attending Physician Statement indicating a primary diagnosis of a fractured rib and secondary diagnoses of bronchitis and fibromyalgia, noting that Huffaker was "able to perform most of her job part of the time," but was still recovering from a fractured rib. During an office visit one month later, Dr. Bozeman noted that Huffaker's pain had worsened to the point that "[t]here is really hardly any place that she doesn't hurt," and diagnosed Huffaker with fibromyalgia, hypertension under good control, hyperlipidemia, arthritis, myalgias, and an elevated level of creatine phosphokinase ("CPK"). He directed that she see a neurologist, a doctor of physical medicine, as well as a rheumatologist.

Dr. Darrell Thomas, a neurologist, examined Huffaker, and found that she was "in no apparent distress," and felt that she "did not have fibromyalgia." A doctor of physical medicine and rehabilitation found that she had generalized muscle pain, "a constellation of symptoms not clearly

identified" and "not entirely consistent with a diagnosis of fibromyalgia," and that her "elevated CPK is suspicious for an underlying myopathic or metabolic process." A cardiologist examined Huffaker, and noted that he was "actually not sure what is going on with this lady. It seems like it is a little more than fibromyalgia. [Fibromyalgia] should not cause abnormal CPK levels." He further noted that she "has some of the features of fibromyalgia," but needed "a full evaluation by a rheumatolog[ist] and neurolog[ist] to see if we are not missing something." And a rheumatologist examined Huffaker and found "no evidence of inflammatory arthropy or neurological focol or motor deficits," "a few tender points that suggest a myofascial component of her symptoms," and that "the most likely diagnosis" was fibromyalgia or chronic fatigue syndrome, but he "would like to obtain additional records and additional laboratory tests."

On June 1, 2004, MetLife arranged for a medical review of Huffaker's file by Dr. Tracey Schmidt, a physician board-certified in internal medicine and rheumatology, who recommended extending Huffaker's disability status pending consideration of further records and test results. In response to Dr. Schmidt's request for information, Dr. Bozeman repeated his opinion that Huffaker's pain was due to fibromyalgia. The neurologist repeated his prior appraisal of Huffaker as "a well-nourished individual in no apparent distress." The doctor of physical medicine submitted MRI results indicating the presence of some disc bulging and degenerative changes, and repeated her impression of "generalized body pain" with unclear etiology. And the cardiologist remarked that he was "certainly not sure what exactly is causing all [of Huffaker's] ills," and that Huffaker's condition "fits along the line of fibromyalgia and chronic fatigue syndrome with some type of mood disorder."

With her short-term disability benefits expiring on July 19, 2004, Huffaker submitted a long-term disability claim, complaining of chronic pain. Dr. Bozeman submitted an Attending Physician

Statement diagnosing Huffaker with fibromyalgia and myofascial pain, noting that Huffaker could work one hour per day and had severe limitations in psychological functioning. MetLife again referred her medical file to Dr. Schmidt for review, who recommended an independent medical examination with a rheumatologist, and tentatively approved Huffaker's claim with continued benefits dependent upon the outcome of the independent medical examination.

In the interim, Huffaker submitted treatment notes from a "new patient consultation" with a rheumatologist, Dr. Kenny Sizemore, who diagnosed Huffaker's condition as "probable fibromyalgia," noting that she was "so tender diffusely, I think even control points are positive." He noted, however, that "it was impossible to determine accurately" whether Huffaker was "seeking some type of 'secondary gain,'" and that he believed Huffaker could improve. He encouraged her to follow up with a psychologist.

On October 7, 2004, Huffaker underwent an independent medical examination with Dr. Jeffrey Uzzle, a physician specializing in orthopedic medicine. Dr. Uzzle's physical examination found as normal Huffaker's: gait pattern; posture; spinal alignment; muscle tone in her upper and lower extremities; range of motion in her shoulders, elbows, wrists, and hands; and her ability to walk on her heels and toes and tandem walk. He found her cervical, thoracic, and lumbosacral range of motion normal and without pain. Dr. Uzzle noted that she described "several episodes that sound psychological in nature." After reviewing her medical records, Dr. Uzzle noted that Huffaker "has been thoroughly evaluated from the standpoint of multiple different specialties and in the end there has been no specific objective and verifiable anatomic problem to explain her varied symptomatology." He characterized Huffaker's case as a "diagnostic dilemma" and expressed concern that her pain disorder was largely psychologically based. He stated that he could not

ascertain why Huffaker stopped working and could "find no objective basis why she cannot return to her work . . . assuming she is psychologically capable." Huffaker later contested the validity of the Dr. Uzzle's findings–alleging that the examination consisted only of Dr. Uzzle's request that she walk on her toes and heels and touch her finger to her nose–but MetLife did not investigate the allegations.

On December 22, 2004, MetLife denied Huffaker's claim, citing the findings of Dr. Uzzle. Huffaker appealed on December 27, 2004, and submitted treatment notes from a psychiatrist, who noted that Huffaker complained of depression, but did not assign any cognitive or functional limitations to her condition. Dr. Bozeman submitted an updated Attending Physician Statement with treatment notes, now opining that Huffaker could work a total of zero hours per day on account of fibromyalgia and chronic myofascial pain syndrome. But he also noted that Huffaker stated that she could consider trying to work, and he directed that she return to work for three hours per day, three days a week, for the next three weeks, and to follow up with him in order to determine whether she could further increase her hours. Huffaker also submitted a letter from her physical therapist, who rated Huffaker's pain as severe and consistent with fibromyalgia, and noted that she could not reasonably be expected to attend a forty-hour work week.

In response, MetLife sent Huffaker's medical file to two physicians for independent file reviews. Dr. Annette DeSantis, a physical medicine and rehabilitation specialist, conducted the first review and concluded that there was no "medical documentation to substantiate functional limitations that would preclude" Huffaker's "ability to perform the material duties" of her job. Dr. DeSantis noted that Huffaker "had extensive testing done, much of which was negative." While acknowledging that Huffaker had "some mildly positive tests," Dr. DeSantis reiterated that she could

find no "actual physical medical condition that would keep [Huffaker] from being able to physically perform her job."

Dr. Edward Ewald, a rheumatologist, conducted the second review of Huffaker's file. He noted that the medical documentation demonstrated "no evidence of any active synovitis," and that Huffaker had normal strength with "no substantial limitation of motion of her joints." He noted that the findings described in Dr. Bozeman's reports "are consistent with but not diagnostic of fibromyalgia[,] since this is basically a diagnosis of exclusion." He stated he could "find no objective evidence in any of these records to substantiate functional limitations that would preclude her ability to perform in material duties of her medium exertion level job. However, it is clear that she does have persistent subjective complaints of muscle pains and joint pains."

On February 10, 2005, MetLife denied Huffaker's appeal, citing the findings of Huffaker's physicians and the independent medical reviewers. Huffaker hired an attorney, who then sought to submit several hundred pages of additional information for consideration. MetLife advised that it would not consider the supplemental documentation, given that it had already made a final decision.

Huffaker filed a lawsuit in federal court seeking review of Metlife's decision. On August 2, 2006, the district court denied Huffaker's motion to permit discovery. On March 8, 2007, the district court issued an opinion granting MetLife's motion for judgment on the administrative record. *Huffaker v. Metropolitan Life Ins. Co.*, No. 3:05-CV-527, 2007 WL 760439 (E.D. Tenn. March 8, 2007).

## II. ANALYSIS

### A. Standard of Review

We review the district court's grant of MetLife's motion for judgment on the administrative

-6-

record de novo, *Wilkins v. Baptist Healthcare Sys. Inc.*, 150 F.3d 609, 613 (6th Cir. 1998), applying the same standard of review of a plan administrator's action as the district court applies. *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 427 (6th Cir. 2006). We employ an arbitrary and capricious standard to review MetLife's decision to deny long-term disability benefits because the Plan confers discretionary authority on the administrator to determine eligibility for benefits and to construe the terms of the Plan.[1] *McDonald v. Western-Southern Life Ins. Co.,* 347 F.3d 161, 168 (6th Cir. 2003). "Under this deferential standard, we will uphold a benefit determination if it is 'rational in light of the plan's provisions.'" *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 298 (6th Cir. 2005) (quoting *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996)). Thus, we will uphold a decision "if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence." *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998) (internal quotations and citation omitted).

The arbitrary and capricious standard, however, is not entirely without "teeth." *McDonald*, 347 F.3d at 172. Oftentimes, a plan administrator operates under a potential conflict of interest because it is both the decision-maker determining which claims are covered, and also the payor of those claims. *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 292 (6th Cir. 2005). In such circumstances, where "the potential for self-interested decision-making is evident," we will take the administrator's conflict of interest into account as a factor in determining whether the administrator's decision was arbitrary and capricious. *Univ. Hosps. of Cleveland v. Emerson Elec. Co.,* 202 F.3d

---

[1]Under the terms of the Plan, the administrator "shall have the complete authority, in its sole and absolute discretion, to administer, apply and interpret the Plan (and any related documents and underlying policies) and to decide all matters arising in connection with the operation or administration of the Plan."

839, 846 n.4 (6th Cir. 2000).

"While several courts have altered the standard of review to something less deferential than the arbitrary and capricious standard where a benefits administrator is operating under a conflict of interest, this Court has not taken that approach." *Calvert*, 409 F.3d at 293 (citation omitted). The inherent "conflict of interest does not displace the arbitrary and capricious standard of review; rather, it is a factor that we consider when determining whether the administrator's decision to deny benefits was arbitrary and capricious." *Evans v. Unum Provident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (citing *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 506 (6th Cir. 2005)).

### B. Plan's Appeal Provision

We first consider Huffaker's argument that MetLife should have considered evidence she submitted to MetLife following its denial of her appeal on February 10, 2005. She contends that MetLife acted arbitrarily in closing the record, given that the Plan "does not explicitly limit MetLife to considering only one appeal."

Although Huffaker is correct that the Plan does not expressly limit MetLife to considering one appeal, the Plan conversely does not allow a claimant to take an unlimited or even a specified number of appeals. The Plan provides for "a review of claims denied in whole or in part." Because the Plan treats a claimant's right to appeal as a singular noun ("*a* review of claims"), MetLife did not act arbitrarily in interpreting the Plan to permit only one appeal. We find persuasive the Fifth Circuit's holding that "the complete description of the process for one appeal without mentioning a second appeal clearly implies that only one appeal is allowed." *Hilton v. Ashland Oil Inc.*, No. 96-40100, 1996 WL 731358, at *8 (5th Cir. Nov. 11, 1996).

MetLife's correspondence with Huffaker is consistent with its contention that Huffaker was entitled to only one appeal. In its initial denial letter, MetLife advised Huffaker that she could appeal by filing a written request within 180 days, and that she should include "any additional comments, documents, records or other information relating to your claim that you deem appropriate for us to give your appeal proper consideration." The denial letter goes on to state: "[i]n the event that your appeal is denied in whole or in part, you will have the right to bring a civil action" under ERISA. Thus, by the explicit terms of this correspondence, Huffaker was advised that she must submit all evidence deemed relevant by her in her appeal of MetLife's benefits determination. The correspondence made clear that the next tier of review after her appeal was not a second internal appeal for MetLife's consideration, but an ERISA action in federal court.

### C. MetLife's Eligibility Determination

### 1. Objective Evidence of Disability

We next consider Huffaker's argument that MetLife's denial of disability benefits was arbitrary and capricious. MetLife contends that its denial was based on Huffaker's failure to prove her disabled status under the terms of the Plan, namely because she provided insufficient objective evidence of disability. We first address whether the terms of the Plan allow MetLife to require that Huffaker present objective evidence of her disabled status. We hold that it may.

The Plan provides that a beneficiary will receive disability benefits once the beneficiary is disabled as defined by the Plan, after the completion of an elimination period. The Plan defines "disabled" as follows:

> **Disabled or Disability:** You are Disabled if, due to sickness or pregnancy or accidental injury for which you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis:

During the first 24 months that benefits under this Plan are paid to you, you are unable to perform each of the material duties of your Occupation.

After benefits under this Plan are paid to you for 24 months, you are unable to engage in any business or occupation or to perform any work for compensation, gain or profit for which you are reasonably fitted by your education, training, background, or experience.

This Court has previously held that a disability benefits plan employing similar eligibility requirements could require a claimant to provide objective evidence of disability. In *Cooper v. Life Ins. Co. of N. America*, we held that "[r]equiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable." *Cooper v. Life Ins. Co. of N. America*, 486 F.3d 157, 166 (6th Cir. 2007) (citing *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 361 (6th Cir. 2002)). The definition of "disability" at issue in *Cooper* required that the claimant prove inability to perform "all the material duties of his or her Regular Occupation," *id*. at 159-60, and did not explicitly require the claimant to provide objective evidence of disability. We found the administrator's objective-evidence-of-disability requirement reasonable, explaining that "[o]bjective medical documentation of [the claimant's] functional capacity would have assisted [the administrator] in determining whether [the claimant] was capable of performing 'all the material duties of her Regular Occupation,' as required by the [long-term disability plan]'s definition of disability." *Id*. at 166.

Here, Huffaker must similarly prove she is "unable to perform each of the material duties of [her] Occupation" to satisfy the Plan's definition of "disability." As in *Cooper*, MetLife could reasonably interpret the Plan's language to require objective evidence of disability. *See also Michele v. NCR Corp.*, No. 94-3518, 1995 WL 296331, at *3 (6th Cir. May 15, 1995) (holding that the administrator did not act arbitrarily or capriciously in denying long-term disability benefits for

chronic fatigue syndrome where the plan requires proof of total disability from "a bodily injury or disease"; and the claimant failed to present sufficient objective medical evidence of total disability).

A claimant could certainly find burdensome a requirement that she proffer objective evidence of fibromyalgia itself, the symptoms of which are largely subjective.[2] But objective evidence of *disability* due to fibromyalgia can be furnished by a claimant without the same level of difficulty. *See Boardman v. Prudential Ins. Co.*, 337 F.3d 9, 16-17 n.5 (1st Cir. 2003) ("While the diagnos[is] of . . . fibromyalgia may not lend [itself] to objective clinical findings, the physical limitations imposed by the symptoms of such illness[] do lend themselves to objective analysis."). One method of objective proof of disability, for instance, is a functional capacity evaluation, a "reliable and objective method of gauging" the extent one can complete work-related tasks. *Cooper*, 486 F.3d at 176 (Sutton, J., concurring in part, dissenting in part). In *Johnson v. Metropolitan Life Ins. Co.*, 437 F.3d 809 (8th Cir. 2006), the Eighth Circuit held that a "plan administrator [can] require objective evidence of a disability, even when the claimant's alleged disability stem[s] from fibromyalgia, so long as the administrator notified the claimant that her file lacked the required objective evidence."

---

[2]The Seventh Circuit has aptly described the difficulties in diagnosing fibromyalgia:

> [F]ibromyalgia, also known as fibrositis[,] is a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and-the only symptom that discriminates between it and other diseases of a rheumatic character-multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

*Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003) (internal quotation marks, alterations, and citations omitted).

*Id*. at 814 (citing *Pralutsky v. Metropolitan Life Ins. Co.*, 435 F.3d 833, 838-40 (8th Cir. 2006)). Here, MetLife notified Huffaker that her file lacked the required objective evidence in its December 22, 2004 letter denying benefits, which stated as its reason for denial: "There is no medical evidence provided by the treating sources to suggest a significant functional impairment or support the severity of this medical condition to prevent you from performing your job." Thus, MetLife did not act unreasonably in requiring objective evidence of disability.

### 2. Dr. Bozeman

We now review whether MetLife's eligibility determination was supported by the evidence. Huffaker contends that she provided MetLife with objective evidence of disability, and refers to three sources: Dr. Thomas, the neurologist; Dr. Bozeman, her family practitioner; and Anita Ferris, the physical therapist. In her argument on appeal that she is disabled under the Plan, however, the documentary evidence that Huffaker relies on from these sources consists of forms submitted to MetLife *after* MetLife's February 10, 2005 denial of her internal appeal.[3] We decline to consider this evidence, because in our review of MetLife's decision, we are "strictly limited to a consideration of the information actually considered by the administrator." *Killian v. Healthsource Provident Admin., Inc.*, 152 F.3d 514, 522 (6th Cir. 1998).

MetLife argues that the evidence considered by MetLife prior to its denial of her internal appeal on February 10, 2005, supports its finding that Huffaker was not disabled under the Plan. MetLife argues that Dr. Thomas's findings do not support a finding of disability, referring to Dr.

---

[3]The medical evidence from Dr. Bozeman consists of a medical information form addressed to the Social Security Administration, dated March 22, 2005. The medical evidence from Dr. Thomas consists of a medical information form supplied by Huffaker's attorney, dated June 6, 2005. The medical evidence from Anita Ferris consists of a medical information form supplied by Huffaker's attorney, dated June 8, 2005.

Thomas's physical examination of Huffaker on May 18, 2004, in which she is described as "a well-nourished individual in no apparent distress." Although Dr. Thomas's treatment notes mention that the purpose of the consultation was to address Huffaker's complaints of muscle cramps and pain described as "excruciating," the medical documentation from Dr. Thomas under consideration by MetLife supports of its finding that she was not disabled.

MetLife explains that it failed to accord great weight to Dr. Bozeman's opinion that Huffaker was disabled because his opinion was "based on Huffaker's self-reported complaints of pain, nothing more." MetLife contends that his opinion is not supported by a functional capacity evaluation, and was contradicted by Dr. Bozeman's findings that Huffaker's muscle strength was normal in all extremities and that she had full range of motion in all joints, and by the negative results of the battery of tests that she underwent. MetLife did not discredit the findings of Anita Ferris, the physical therapist, on appeal.

In *Yeager*, we observed that "complaints of fatigue and joint pain" are "types of subjective complaints [that] are easy to make, but almost impossible to refute." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 382 (6th Cir. 1996) (holding that absent any "definite anatomic explanation of [a claimant]'s symptoms," an administrator's decision to deny disability benefits due to fibromyalgia was not arbitrary and capricious); *cf. Cooper*, 486 F.3d at 174 (Sutton, J., concurring in part, dissenting in part) ("[S]ubjective complaints of back pain by themselves do not compel an administrator to grant disability benefits"). MetLife did not arbitrarily refuse to credit Dr. Bozeman's findings given the inconsistency between Huffaker's subjective complaints of pain and Dr. Bozeman's findings of normal muscle strength and range of motion.

### 3. Dr. Uzzle

Huffaker next argues that MetLife erred in its reliance on the independent medical examination of Dr. Uzzle. As her first reason, Huffaker argues that Dr. Uzzle, a doctor of orthopedic medicine, is unqualified to diagnosis fibromyalgia. She argues that a rheumatologist should instead have conducted the examination, because fibromyalgia is a rheumatological condition. But Huffaker cites no factual or legal authority for the proposition that only a rheumatologist may diagnose fibromyalgia. Her insistence on such a rule is inconsistent with her demand that great weight be given to the opinions of Dr. Thomas, a neurologist; Dr. Bozeman, a family practitioner; and her physical therapist, a non-physician. In any event, MetLife did in fact rely on the medical opinion of a rheumatologist, Dr. Ewald, who reviewed Huffaker's medical file.

Huffaker next challenges Dr. Uzzle's credibility by arguing that he failed to address whether she had fibromyalgia. Our review of the content of Dr. Uzzle's report, however, does not lead us to this conclusion. His report noted that he reviewed records from Dr. Bozeman and others, and that "[Huffaker] is at a point one would characterize as a diagnostic dilemma." He specifically noted that "[f]ibromyalgia has been considered," and concluded from his review of Huffaker's medical records that she "has been thoroughly evaluated from the standpoint of multiple different specialties and in the end there has been no specific objective and verifiable anatomic problem to explain her varied symptomatology." And he diagnosed Huffaker with "[c]hronic pain disorder." The critical question for purposes of Huffaker's eligibility for disability benefits is not whether she does or does not have fibromyalgia, but whether she is disabled under the plan. Dr. Uzzle's conclusion after conducting a physical examination was that he could "find no objective basis why she cannot return to her work as a thrift store outlet manager at this point assuming she is psychologically capable of doing this."

Huffaker then argues that MetLife failed to investigate her allegation that Dr. Uzzle did not examine her. But two physician file-reviewers, Drs. Ewald and DeSantis, examined Huffaker's medical file, which included Dr. Uzzle's findings. Their review of Dr. Uzzle's findings indicates no basis for determining them unreliable. So even if MetLife did have a duty to investigate Huffaker's allegation, that duty would have been satisfied by the file review undertaken by Drs. Ewald and DeSantis.

Finally, Huffaker argues that MetLife erred in failing to investigate Dr. Uzzle's concern that her complaints of pain might be psychosomatic. However, Huffaker never claimed a psychiatric impairment during the administrative process, but rather claimed that her disability was due to fibromyalgia. In any event, the administrative record includes treatment notes from a psychiatrist, from as late as January 1, 2005. Although the psychiatrist prescribed the medication Cymbalta, he did not diagnose any cognitive or functional limitations precluding her from working.

Accordingly, we find that MetLife did not act arbitrarily or capriciously in relying on Dr. Uzzle's medical opinion as a basis for the denial of benefits.

### 4. Drs. Ewald and DeSantis

Huffaker next argues that MetLife erred in relying on the opinions of Drs. Ewald and DeSantis because reliance on non-examining medical sources is "disfavored," and they ignored functional limitations diagnosed by Dr. Bozeman. But it is well-established that MetLife need not necessarily defer to the opinions of treating physicians. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). We have held that "[g]enerally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another . . . the plan administrator's decision cannot be said to have been arbitrary and capricious." *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d

-15-

161, 169 (6th Cir. 2003).  And we observed in *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 295 (6th Cir. 2005), that "reliance on a file review does not, standing alone, require the conclusion that [the administrator] acted improperly."  Thus, we "find nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination."  *Id*. at 296.

Although "the failure to conduct a physical examination–especially where the right to do so is specifically reserved in the plan–may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination," *id.* at 295, this case does not present such an instance.  Here, MetLife obtained an independent medical examination, namely that of Dr. Uzzle.  Dr. Uzzle's examination of Huffaker, however, was unfavorable to her disability claim.  He personally examined Huffaker and determined that she was not disabled, noting the absence of "specific objective and verifiable anatomic problem to explain her varied symptomatology."

Our review of Drs. Ewald and DeSantis's reports indicates that they reviewed the findings of Dr. Bozeman, and each found that Huffaker's medical record did not show the existence of a functional limitation that would prevent Huffaker from doing her job.  Dr. DeSantis's report mentions that she could find no "actual physical medical condition that would keep [Huffaker] from being able to physically perform her job."  Dr. Ewald concludes in his report that he could "find no objective evidence in any of these records to substantiate functional limitations that would preclude her ability to perform in material duties of her medium exertion level job."  Because MetLife validly exercised its right to rely on the opinions of physicians other than the treating physician, *see McDonald,* 347 F.3d at 169, we find Huffaker's claim of error with respect to Drs. Ewald and DeSantis without merit.

### D. Discovery Motion

Huffaker argues that the district court erred in denying her motion for discovery beyond the administrative record for the purpose of showing a procedural violation. We review the district court's decisions on discovery matters for an abuse of discretion. *Green v. Nevers*, 196 F.3d 627, 632 (6th Cir. 1999).

In the proceedings below, Huffaker filed a motion to adjust the scheduling order to allow her to take discovery. She sought discovery for the purpose of seeking information about the physicians who evaluated her claim relevant to the issues of due process and bias, including their employment relationship with MetLife, their compensation, and the number of claims they reviewed for MetLife. She supported her motion with information relating to three physician consultants not having involvement in her claim. The district court denied the motion, upholding the magistrate judge's memorandum and order, which held that "[t]he mere fact that MetLife may have used three other physicians numerous times in other cases simply does not demonstrate good cause to engage in discovery with respect to the physicians who reviewed the plaintiff's claim."

In an ERISA claim for benefits action, the district court's review is generally "based solely upon the administrative record." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). Evidence outside the administrative record may be considered "if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part." *Id*. "This also means that any prehearing discovery at the district court level should be limited to such procedural challenges." *Id*.

A claimant cannot obtain discovery beyond the administrative record–even if limited to a procedural challenge–merely by alleging a procedural violation. *See Likas v. Life Ins. Co. of N.*

*America*, 222 Fed. App'x 481, 486 (6th Cir. 2007)"[A] mere allegation of bias is insufficient to 'throw open the doors of discovery' in an ERISA case.") (citations and quotation marks omitted). Otherwise, the policy rationale for constrained district court review would be defeated.[4]

In *Putney v. Medical Mutual of Ohio*, 111 Fed. App'x 803 (6th Cir. 2004), we determined that a claimant must make a predicate showing with respect to an alleged procedural violation to be granted further discovery. The claimant in *Putney* argued that the district court erred in denying discovery on a procedural challenge to the denial of a disability benefits claim. However, the *Putney* claimant "presented virtually no evidence of procedural violations," "presented absolutely no evidence of bias," and there were no facts in the record "to support a claim that discovery might lead to such evidence." *Id*. at 807. We concluded that "mere allegation of bias is not sufficient to permit discovery under *Wilkins*' exception." *Id*. Even though the claimant alleged that the administrator "refused to permit him to submit information during his administrative appeal," we found this also to be a "mere allegation," insufficient to require discovery. *Id*.

Here, Huffaker is like the *Putney* claimant. The only evidence offered in support of the allegation of procedural error is that MetLife has a "habit" of repeatedly using the same consultants.

_____

[4]This Court has described the policy reasons for the district court's review of only within-record evidence as follows:

> A primary goal of ERISA was to provide a method for workers and beneficiaries to resolve disputes over benefits inexpensively and expeditiously. Permitting or requiring district courts to consider evidence from both parties that was not presented to the plan administrator would seriously impair the achievement of that goal. If district courts heard evidence not presented to plan administrators, employees and their beneficiaries would receive less protection than Congress intended.

*Perry v. Simplicity Engineering,* 900 F.2d 963, 967 (6th Cir. 1990) (citations omitted).

-18-

As MetLife notes, the evidence puts forward a "generalized claim of financial conflict of interest on the part of MetLife and the independent physician consultants who reviewed" her medical file. The consultants whom Huffaker alleges MetLife habitually use did not even review her medical file, so the evidence does not support her suggestion that the independent physicians in this case took adverse action regarding her disability claim. Huffaker presents no actual evidence of a procedural violation as to the claim, and because "mere allegation of bias is not sufficient to permit discovery," *Putney*, 111 Fed. App'x at 807, the district court did not err in denying her discovery motion.

## III. CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's judgment on the administrative record for MetLife, and **AFFIRM** the denial of Huffaker's motion for discovery.