NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0338n.06

Case No. 22-1960

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| JACQUELINE AVERY, | ) | **FILED**<br>Jul 24, 2023<br>DEBORAH S. HUNT, Clerk |
| Plaintiff - Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| SEDGWICK CLAIMS MANAGEMENT SERVICES, INC. and FCA US LLC LONG-TERM DISABILITY BENEFIT PLAN, | ) | |
| | ) | |
| Defendants - Appellees. | ) | O P I N I O N |
| | ) | |

Before: McKEAGUE, GRIFFIN, and MURPHY, Circuit Judges.

**McKEAGUE, Circuit Judge.** For roughly two years, Jacqueline Avery received long-term disability benefits from her former employer, Chrysler Group LLC (Chrysler), through its FCA US LLC Long Term Disability Benefit Plan (the Plan). The Plan's third-party claims administrator, Sedgwick Claims Management Services, Inc. (Sedgwick), later terminated those benefits after concluding that Avery no longer qualified as "totally disabled" within the meaning of the Plan. Avery brought this action under 29 U.S.C. § 1332(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA) to recover and reinstate her long-term disability benefits. The district court granted judgment on the administrative record in favor of Sedgwick and the Plan, and Avery now appeals. For the following reasons, we affirm.

**I**

A. **Factual Background**

In 2006, Jacqueline Avery was on a camping trip when she fell and fractured her right ankle. She largely recovered, but severe pain in her right leg spontaneously returned in 2011. At the time, Avery worked for Chrysler as a finance specialist, and the persistent pain began to impede her ability to work. In July 2011, Avery was diagnosed with "advance peripheral deyelinatibe and axonal polyneuropathy [of the] lower legs," and her last date worked was July 15, 2011. A.R. 195.

Avery initially applied for and received short-term disability benefits under Chrysler's Disability Absence Plan. But when her eligibility for short-term benefits expired, Avery converted her claim into one for long-term benefits. To be eligible for long-term disability benefits, the Plan states in ungrammatical fashion that a participant must "be 'totally disabled' because of disease or injury so as during the first 24 months of disability to be unable to perform the duties of the Participant's occupation, and after the first 24 months of disability be unable to engage in regular employment or occupation with the Corporation." A.R. 1206.

Due to the nature of Avery's condition, Sedgwick referred Avery's claim to two board-certified neurologists, Dr. Hermann Banks, M.D., and Dr. David Gaston, M.D., for independent medical examinations. Dr. Banks opined that Avery suffered from "[r]ight lower extremity pain with paresthesia and dysesthesia" and recommended that Avery not return to work. A.R. 793. Dr. Gaston similarly identified "exquisite pain on motion of the right distal leg and foot," and diagnosed Avery with Complex Regional Pain Syndrome Type II. Relying on the results of these medical examinations, among other medical records, Sedgwick approved Avery for long-term disability benefits effective August 10, 2012, on the basis of "totally disabling condition(s) of Right Lower Extremity Neuropathy & reflex sympathetic dystrophy lower extremity." A.R. 1055.

Pursuant to the terms of the Plan, Sedgwick also required Avery to apply for Social Security Disability Insurance (SSDI) benefits. The Social Security Administration (SSA) awarded Avery monthly SSDI benefits in the amount of $2,024, retroactive to January 2012. Sedgwick then requested and received reimbursement for overpayment in the amount of $15,069.42.

Throughout 2013 and early 2014, Avery continuously furnished medical records from her treating physicians to substantiate her disability, and Sedgwick repeatedly approved Avery's long-term disability benefits under the Plan. But in June 2014, Chrysler's Special Investigations Unit surveilled Avery and purportedly observed her driving—something she is medically restricted from doing. Chrysler also suspected that Avery was running a business out of her home. This prompted Chrysler to request an additional independent medical examination. Sedgwick scheduled the requested medical exam with Dr. Joel Shavell, D.O., who is board certified in internal medicine and rheumatology; he examined her on July 15, 2014. Dr. Shavell observed that Avery "walked in quickly with a normal gait and had no problems getting undressed, and no problems getting in and out of the room; no problems moving, and no problems functionally." A.R. 977. Based on these observations, Dr. Shavell concluded:

> At this time, I do not see any evidence of a regional complex pain issue, and normally with these pain syndromes, they are so severe and difficult that patients hardly recover fully. They have some residual, such as walking with a limp, or inability to move a leg, as well as sensitivity to touch. These would be some of the findings that would be common and Ms. Avery exhibits none of them. . . .
>
> Based on the fact that I do not find a regional complex pain issue, and because she does not have a venous issue, and based on the fact that when I examined her ankle she [can] bear weight on the ankle, on her heels and toes despite her weight, I do not find any physical evidence to substantiate at this point any disability whatsoever. It is my opinion that she can return to full duty work, as of today's date.

A.R. 978–79.

After receiving the results of the independent medical examination, Sedgwick notified Avery via letter dated July 21, 2014, that she had been found able to work, and requested that she report to her plant medical department for further evaluation. Sedgwick indicated that Avery's benefits "may be suspended effective July 21, 2014, pending the outcome of the ability to work examination." A.R. 974. On July 22, 2014, Avery reported to Chrysler's medical department where the plant medical doctor determined that Avery was able to return to work.

During the evaluation, a plant medical nurse provided Avery with a copy of Dr. Shavell's narrative report. Believing the report to be filled with "bold face lies," Avery called Sedgwick to complain. A.R. 944. A Sedgwick representative instructed Avery to formalize her complaints in writing, which she did a few days later. On July 28, 2014, Avery sent a letter to Sedgwick "to appeal [her] recent return to work decision" and "to challenge several statements" made by Dr. Shavell. A.R. 964–66. On August 4, 2014, Sedgwick acknowledged receipt of Avery's "request for appeal" and indicated that her claim would be reviewed by Sedgwick's Appeals Unit. A.R. 957. On August 8, 2014, Sedgwick called Avery to ask whether she intended to provide any additional information or documentation. Avery responded that she did not. A.R. 949.

Internal documents indicate that Sedgwick's July 21, 2014, letter was neither a formal nor final denial letter, as it did not "outlin[e] the reason for denial or [detail] appeal rights. The letter only request[ed] that the claimant RTW [return to work]." A.R. 458. Rather, Sedgwick did not issue its formal benefits determination until roughly one month later, via letter dated August 20, 2014, wherein Sedgwick set forth the Plan's eligibility criteria, articulated the reasons for its benefits denial, and outlined the appeals procedures. Nonetheless, Sedgwick continued to treat Avery's July 28, 2014, letter as an appeal and reviewed Avery's claim in the ordinary course.

As part of this review process, Sedgwick referred Avery's claim for an independent record review (IRR) with Dr. David Hoenig, M.D., a specialist in neurology and pain medicine. Dr. Hoenig reviewed Avery's medical records and concluded that "[b]ased on the documentation provided, and from a neurological perspective only, [Avery] is not disabled from performing any work as of 07/22/14." A.R. 663.

By letter dated September 12, 2014, Sedgwick formally denied Avery's appeal. The letter indicated that the decision was "the Claim Administrator's final decision," and that Avery had "the right to bring a civil action under ERISA" and was "entitled to receive[], upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to [her] claim for benefits." A.R. 659.

Avery did not respond until more than eight months later, when her attorney sent a letter to Sedgwick on May 18, 2015, demanding that "Ms. Avery's benefits be immediately reinstated with retroactive pay forthwith." A.R. 654. Attached to this demand was a letter from Dr. Brengel, Avery's primary care doctor who specializes in family medicine, wherein Dr. Brengel disputed Dr. Shavell's findings and attempted to bolster Avery's claimed disability. Specifically, Dr. Brengel referenced "an EMG performed by K. Fram, M.D., in December of 2014," and indicated that "Dr. Fram believes that Ms. Avery has reflex sympathetic dystrophy in her right lower extremity by history, chronic S1 radiculopathy bilaterally, severe peripheral polyneuropathy, and bilateral tarsal tunnel syndrome." A.R. 655. On this basis, Dr. Brengel concluded that Plaintiff "remain[ed] disabled due to the difficulties with her right leg." *Id.*

Despite having no obligation to do so, Sedgwick responded to the letter by initiating a "re-review" of Avery's claim. A.R. 651. As part of this voluntary re-review, Sedgwick offered Avery an opportunity to submit additional medical information and documentation before July 28, 2015,

but Avery never submitted additional records.[1] Sedgwick also referred Avery's claim to Dr. Mark N. Friedman, D.O, a board-certified neurologist and specialist in internal medicine, for another IRR. Dr. Friedman reviewed Avery's medical records and concluded that Avery "is not disabled from performing any work as of 07/22/14." A.R. 601. Relying on Dr. Friedman's report, Sedgwick upheld its decision to terminate Avery's long-term disability benefits. By letter dated September 30, 2015, Sedgwick informed Avery that she no longer satisfied the Plan's eligibility requirements. The letter also outlined her appeal rights. Avery did not appeal that decision.

## B. Procedural Posture

Avery filed suit in the Eastern District of Michigan pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), to recover long-term disability benefits allegedly owed to her under the terms of the Plan. The complaint appears premised on Sedgwick's September 12, 2014, denial, which Avery refers to as "the final decision on Ms. Avery's claim." R. 1, PID 11. It does not reference Sedgwick's voluntary re-review or the decision issued on September 30, 2015.

She also filed a "Statement of Procedural Challenge," alleging various procedural errors committed by Sedgwick and requesting that the court schedule a status conference to address discovery. Defendants filed a "Motion to Strike Statement of Procedural Challenge," which the district court construed as a motion to review and reject Avery's Statement. The district court rejected Avery's Statement, finding that no valid procedural challenge was presented justifying further discovery.

Thereafter, the parties filed competing motions for judgment on the administrative record. The district court denied Avery's motion and granted judgment on the administrative record in favor of Sedgwick and the Plan. This appeal followed.

---

[1] Avery claims she never received this letter. *See* Appellant's Br. at 21.

## II

"We review *de novo* the decision of a district court granting judgment in an ERISA disability action based on an administrative record." *DeLisle v. Sun Life Assurance Co. of Can.*, 558 F.3d 440, 444 (6th Cir. 2009) (internal quotation marks omitted). And when the insurance plan administrator is vested with discretion to interpret the plan, we review the administrator's decision to deny benefits under the arbitrary and capricious standard. *Helfman v. GE Grp. Life Assurance Co.*, 573 F.3d 383, 392 (6th Cir. 2009). Here, neither party disputes that the Plan gives Sedgwick this discretion. We therefore review Sedgwick's decision to terminate Avery's long-term disability benefits under the arbitrary and capricious standard. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).[2] Finally, we review de novo "the question of whether the procedure employed by the fiduciary in denying the claim meets the requirements of Section 1133." *Kent v. United of Omaha Life Ins. Co.*, 96 F.3d 803, 806 (6th Cir. 1996).

### A. Sedgwick Satisfied ERISA Procedural Requirements

On appeal, Avery raises a series of procedural objections, broadly arguing that Sedgwick violated ERISA claims procedures, and that in so doing, Sedgwick denied her claim a full and fair review. Specifically, Avery alleges the following: (1) Sedgwick's initial denial letter failed to comply with ERISA requirements, (2) Sedgwick did not afford Avery a reasonable opportunity to appeal, (3) Sedgwick did not provide Avery with an opportunity to supplement the administrative record, (4) Dr. Shavell lacked the required training and experience, and (5) Sedgwick omitted

---

[2] Relying on the Second Circuit's opinion in *Halo v. Yale Health Plan*, 819 F.3d 42 (2d Cir. 2016), Avery argues that the de novo standard of review should apply to our review of the administrator's decision to terminate benefits *because* Sedgwick allegedly failed to comply with the claims procedure regulation. Appellant's Br. at 25. In *Halo*, the Second Circuit held that "a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503-1, will result in that claim being reviewed *de novo* in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the regulation in the processing of a particular claim was inadvertent *and* harmless." 819 F.3d at 45. However, this circuit has yet to adopt such a rule, and we decline to do so here.

relevant documents from the administrative record. Addressing each procedural objection in turn, we conclude that Sedgwick substantially complied with ERISA claims procedures.

*ERISA Procedural Requirements*

We begin with a brief overview of the ERISA regulations that govern employee benefit claims procedures. ERISA ensures that fiduciaries administer employee benefit plans "solely in the interest of the participants and beneficiaries." 29 U.S.C. §§ 1104(a)(1), 1001(b). Under ERISA, the Secretary of Labor has the authority to enact regulations that govern the administration of employee benefit claims. *Id.* §§ 1133, 1135. Section 1133 provides that every employee benefit plan must:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

*Id.* § 1133. We have held that the "essential purpose" of these requirements is twofold: "(1) to notify the claimant of the specific reasons for a claim denial, and (2) to provide the claimant with an opportunity to have that decision reviewed by the fiduciary." *Wenner v. Sun Life Assurance Co. of Can.*, 482 F.3d 878, 882 (6th Cir. 2007) (emphasis and citation omitted).

In deciding whether a plan has satisfied the requirements of § 1133, we employ a "substantial compliance" test. *Id.* Under this test, all communications between the claimant and the administrator are considered. "If the communications between the administrator and participant as a whole fulfill the twin purposes of § 1133, the administrator's decision will be upheld even

where the particular communication does not meet those requirements." *Id.* (internal quotation marks omitted).

Additional procedural safeguards are codified in 29 C.F.R. § 2560.503–1, titled "Claims procedure." Specifically, "in the context of an administrative appeal of an adverse benefits determination, 29 C.F.R. § 2560.503–1(h)(2) outlines the essential procedural requirements for a full and fair review." *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 502 (6th Cir. 2010). That provision provides, in part:

> [T]he claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures— . . .
>
> (ii)    Provide claimants the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits;
>
> (iii)    Provide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. . . .
>
> (iv)    Provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

29 C.F.R. § 2560.503–1(h)(2). Furthermore, "group health plans," such as the Plan that is at issue in this case, are required to comply with the following:

> (i)    Provide claimants at least 180 days following receipt of a notification of an adverse benefit determination within which to appeal the determination;
>
> (ii)    Provide for a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual; [and]
>
> (iii)    Provide that, in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, . . . the appropriate

named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment. . . .

*Id.* § 2560.503–1(h)(3)(i)–(iii).

*Notice and an Opportunity to Appeal*

Avery's first procedural objection takes issue with Sedgwick's July 21, 2014, letter. She argues that the letter failed to "inform her that she could submit comments or other information, that she could obtain documents relevant to her claim in order to prepare an appeal, and did not describe any appeal procedures." Appellant's Br. at 31–32. In response, Sedgwick argues that its letter was neither a formal benefit determination nor final claim denial. Rather, the letter merely intended to advise Avery of the results of her independent medical examination and to instruct her to report to her plant medical department for an ability-to-work determination. Sedgwick contends that *later* communications—such as the August 20, 2014, letter terminating Avery's benefits, the September 12, 2014, letter denying Avery's appeal, and the September 30, 2015, letter upholding the benefits denial upon re-review—constitute benefits determinations, and that each complied with ERISA.

We need not resolve whether Sedgwick's July 21, 2014, letter was in fact a formal benefit determination, because Sedgwick's collective communications with Avery substantially complied with ERISA's procedural requirements. *See Kent*, 96 F.3d at 807 (holding that, despite technical deficiencies in the insurer's denial letters, "when viewed in light of the myriad of communications between claimant, her counsel and the insurer, [the letters] were sufficient to meet the purposes of Section 1133 in insuring that the claimant understood the reasons for the denial of the claim as well as her rights to review of the decision"). Although Sedgwick's July 21, 2014, letter undoubtedly fell short of meeting the requirements articulated in § 2560.503–1(h), its August 20,

2014, denial letter corrected any deficiencies. Avery was made aware of the reasons for Sedgwick's benefits denial (i.e., the results of Dr. Shavell's independent medical examination) and of her appeal rights. Collectively, therefore, Sedgwick's communications with Avery satisfied the dual purposes behind (and plain text of) Section 1133. *See Wenner*, 482 F.3d at 882; *Putney v. Med. Mut. of Ohio*, 111 F. App'x 803, 807 (6th Cir. 2004) (finding that an administrator's failure to satisfy ERISA notice requirements was "neither significant nor outcome determinative" where the "procedural failures did not prevent [the claimant] from gaining information necessary to contest his denial of benefits").

Avery's argument that Sedgwick deprived her of an opportunity to appeal its adverse benefit decision fails for similar reasons. First, on July 28, 2014, Avery "appealed" the results of Dr. Shavell's independent medical examination, albeit before receiving Sedgwick's August 20, 2014, letter. Sedgwick ultimately treated Avery's July 28, 2014, letter as a proper and timely appeal, and it reviewed Avery's claim as it would any other appeal. Thereafter, Sedgwick effectively afforded Avery a second appeal by voluntarily re-reviewing her claim in 2015. And finally, Sedgwick provided Avery with an opportunity to appeal its September 30, 2015, decision, which upheld the termination of her long-term disability benefits upon re-review, but Avery chose not to appeal that decision.

Given this posture, Avery cannot argue that she was denied a reasonable opportunity to appeal Sedgwick's decision. Put plainly, Avery *did* appeal the termination of her long-term disability benefits—twice. And when afforded an additional opportunity to appeal Sedgwick's final benefits determination in 2015, Avery declined to do so. In sum, we simply cannot see how Sedgwick's procedures fell short of providing Avery's claim a meaningful review.

*Opportunity to Supplement and Access the Record*

Next, Avery contends that "Sedgwick did not provide [her] with an opportunity to submit comments or documents in response to the initial benefit decision before issuing the final decision," in violation of 29 C.F.R. § 2560.503–1(h)(2)(ii). Reply Br. at 10. Again, we disagree.

Before issuing its initial benefits denial, Sedgwick contacted Avery to ask whether she intended to provide any additional information, to which she responded "no." A.R. 949. Likewise, during its voluntary re-review, Sedgwick afforded Avery the opportunity to supplement the record with any additional medical information or documentation, but Avery declined to do so. Most important, however, is that Avery *did* submit comments in response to Dr. Shavell's independent medical examination, and those comments were considered throughout the appeals process. For instance, Dr. Hoenig's IRR report references Avery's "appeal letters" dated July 28, 2014. And Dr. Friedman's IRR report notes that, "[o]n 07/28/14, the claimant wrote an appeal letter refuting many of the physical examination findings, observations, and conclusions by Dr. Shavell." A.R. 607. Nevertheless, the applicable regulations do not require plan administrators (or their consultants) to reference a claimant's comments with particularity. They merely require that plans "[p]rovide claimants *the opportunity to submit* written comments." 29 C.F.R. § 2560.503–1(h)(ii) (emphasis added). And in this case, for the reasons already stated, Sedgwick and the Plan provided Avery this opportunity.

Relatedly, Avery argues that Sedgwick failed to provide her "with reasonable access to all of the information relevant to her claim for benefits," in violation of 29 C.F.R. § 2560.503–1(h)(2)(iii). Reply Br. at 10. We find no evidence in the record to support this assertion. While claimants are entitled to reasonable access to records relevant to their claim, this access is provided

"upon request." 29 C.F.R. § 2560.503–1(h)(2)(iii). And there is no indication that Avery ever requested access to records or that she was denied access following such request.

*Dr. Shavell's Training and Experience*

Next, Avery argues that Dr. Shavell "did not have appropriate training and experience in the field of neurology" necessary to evaluate her condition, in violation of 29 C.F.R. § 2560.503– 1(h)(3)(iii). Appellant's Br. at 23. Again, Avery's procedural challenge lacks merit. Although it is true that Dr. Shavell is not a board-certified neurologist, his independent medical examination was not the basis for Sedgwick's final determination. Rather, Sedgwick relied on IRRs conducted by two board-certified neurologists, Dr. Hoenig and Dr. Friedman, to terminate Avery's long-term disability benefits.

Furthermore, the requirement that a group health plan "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment," applies only "in deciding an appeal of any adverse benefit determination." 29 C.F.R. § 2560.503–1(h)(3)(iii). Because Dr. Shavell was not consulted in deciding an appeal, his training and experience is procedurally irrelevant.

*Documents Omitted from the Administrative Record*

Finally, Avery argues that Sedgwick deliberately omitted relevant documents from the administrative record. Specifically, she alleges that Sedgwick failed to include evidence of "actual surveillance" and omitted documents related to her Social Security disability award. Appellant's Br. at 33–34. Again, Avery's allegation lacks support.

Sedgwick included within the administrative record an email description of surveillance that took place in April 2014. At the time, Chrysler's Corporate Investigations department observed Avery driving on several occasions and suspected that she may be running a business out

of her home. An investigator communicated these observations and suspicions to Chrysler's Special Investigations Unit via email. But beyond this email description, which is already included in the administrative record, there is no indication that any other documentation pertaining to Chrysler's surveillance—written, visual, or otherwise—even exists. Avery's suggestion that "actual surveillance" has been omitted from the administrative record is pure speculation.

And the same is true for Social Security Disability records. The administrative record includes evidence of the following: the Plan's requirement that Avery apply for Social Security disability benefits, evidence of Avery's application for Social Security disability benefits, the Social Security Administration's monthly SSDI benefit award of over $2,000, and Sedgwick's reimbursement in the amount of over $15,000 for overpayment. Avery speculates that, because Sedgwick facilitated her Social Security application process, Sedgwick must possess additional documents related to her Social Security disability award. But again, this is mere speculation. Avery cannot identify any documents within Sedgwick's possession that have been omitted from the administrative record. If Avery wished to include additional Social Security documentation in the administrative record, she should have requested said documents from the SSA directly and supplemented the record when given the opportunity to do so.

## B. Sedgwick's Decision Was Not Arbitrary or Capricious

Having addressed Avery's procedural objections—i.e., objections to *how* the benefits decision was made—we turn to Avery's contention that Sedgwick simply made the wrong decision. As stated above, because the Plan grants Sedgwick the discretionary authority to determine eligibility for benefits and to construe the Plan's terms, we review Sedgwick's decision to terminate Avery's long-term disability benefits under the arbitrary and capricious standard.

*McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014); *see also Firestone*, 489 U.S. at 115.

Arbitrary and capricious review "is the least demanding form of judicial review of administrative action." *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). Under this extremely deferential standard, we need only decide "whether the plan administrator's decision was rational in light of the plan's provisions." *Id.* (internal quotation marks omitted). We will uphold Sedgwick's decision if "it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991). "[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002). The burden is on the claimant to show that the administrator acted arbitrarily. *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 343 (6th Cir. 2011).

With that being said, the arbitrary and capricious standard is not "without some teeth." *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (citation omitted). "[M]erely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005). Instead, "[s]everal lodestars guide our decision: the quality and quantity of the medical evidence; the existence of any conflicts of interest; whether the administrator considered any disability finding by the Social Security Administration; and whether the administrator contracted with physicians to conduct a file review

as opposed to a physical examination of the claimant." *Shaw v. AT&T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 547 (6th Cir. 2015) (internal quotation marks omitted). In conducting our review, we may generally "consider only the evidence available to the administrator at the time the final decision was made." *Id.*

Avery alleges that Sedgwick's benefits denial was arbitrary and capricious because Sedgwick (1) ignored favorable evidence, (2) improperly relied on file reviews conducted by physicians who were not provided adequate documentation, and (3) ignored the Social Security Administration's disability finding. We will address each substantive challenge in turn.

*Sedgwick's Review of the Evidence*

First, Avery argues that Sedgwick "ignored and selectively reviewed" the evidence. Appellant's Br. at 41. Avery is correct that "administrators may not selectively review the administrative record by picking out the opinions of the doctors that support their decisions while ignoring the opinions of a participant's treating doctors that do not." *Autran v. Proctor & Gamble Health & Long-Term Disability Benefit Plan*, 27 F.4th 405, 415 (6th Cir. 2022). Instead, administrators must "consider all opinions on both sides of a disputed disability question." *Id.*

But here, we find that the physicians whom Sedgwick consulted to evaluate Avery's claim engaged in a fulsome review of the record—including the medical evidence provided by Avery's treating physicians. Dr. Hoenig, for example, reviewed records from Avery's primary care physician, Dr. Brengel. Dr. Hoenig also reviewed the independent medical examination reports from Dr. Banks and Dr. Gaston, both of whom had previously found Avery totally disabled. Dr. Hoenig even attempted (to no avail) to contact Dr. Nounou, one of Avery's treating physicians, to discuss Avery's history. Although a plan administrator need not "accord special deference to the opinions of treating physicians," *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831

(2003), the record reveals that Sedgwick took Avery's doctors' opinions seriously. Indeed, Dr. Hoenig referred to their findings as "clinical[ly] significant." A.R. 663. Relying on Dr. Hoenig's file review, among other medical records, Sedgwick concluded that the documentation provided did not support Avery's claimed disability.

A year later, upon re-review of Avery's claim, Sedgwick consulted Dr. Friedman, who also engaged in a comprehensive review of the record. Like Dr. Hoenig, Dr. Friedman reviewed extensive medical records, including those provided by Avery's treating physicians, as well as the results of Dr. Banks' and Dr. Gaston's independent medical examinations. Dr. Friedman contacted and spoke with a nurse in Dr. Nounou's office. And Dr. Friedman even credited Avery's subjective reports of pain: "the claimant reports that she has ongoing symptoms related to complex regional pain syndrome including walking with a limp and sensitivity to touch to the legs. She reported that she was bedridden several days per week and had difficulties doing daily activities such as cooking, cleaning, and shopping." A.R. 600. Nonetheless, in reviewing Avery's medical records, Dr. Friedman concluded that, "[b]ased on the clinical evidence provided for review, the employee does not require any restrictions on their work duties at any point during the dates of claimed disability in order to return to work." A.R. 601. Relying on Dr. Friedman's report, Sedgwick upheld its termination of Avery's long-term disability benefits, citing "no sufficient clinical evidence to support any restrictions and limitations." A.R. 593.

In rejecting the opinion of a treating physician, a plan administrator need only offer "reasons for adopting an alternative opinion" to survive arbitrary and capricious review. *Shaw*, 795 F.3d at 549. And "a lack of objective medical evidence upon which to base a treating physician's opinion has been held sufficient reason for an administrator's choice not to credit [an] opinion." *Gilewski v. Provident Life and Accident Ins. Co.*, 683 F. App'x 399, 406 (6th Cir. 2017).

Here, Sedgwick rejected the opinions of Avery's treating physicians based on the opinions of Dr. Hoenig and Dr. Friedman, who concluded that the objective medical evidence in Avery's file did not support her claimed disability. And we can discern no selective review by the physicians who reviewed Avery's files. Indeed, their differences from earlier opinions can be explained by the "extensive treatment" that Avery underwent in the interim—treatment that drastically reduced her pain levels. A.R. 608. Accordingly, we find that Sedgwick engaged in a deliberate, principled reasoning process when it decided to terminate Avery's long-term disability benefits.

*Sedgwick's Reliance on Independent Record Reviews*

Next, Avery argues that "Sedgwick's reliance on record review consultants who were not provided appropriate records . . . was also arbitrary and capricious." Appellant's Br. at 36. As an initial matter, we note that Sedgwick's decision to conduct IRRs—or "file reviews"—rather than physical examinations is a factor that we must consider in determining whether Sedgwick acted arbitrarily or capriciously, but that there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005). Instead, an administrator's decision to conduct an IRR in lieu of a physical examination is "just one more factor to consider in our overall assessment of whether [the administrator] acted in an arbitrary and capricious fashion." *Id.* at 295.

At different points in the review process, Sedgwick referred Avery's claim to two independent physician consultants, Dr. Hoenig and Dr. Friedman, for file reviews. Both doctors reviewed Avery's medical records, but neither physically examined her, before providing thorough reports. In their IRRs, Dr. Hoenig and Dr. Friedman identified the medical records that they reviewed and provided detailed accounts of Avery's medical history. Both doctors also acknowledged Avery's prior limitations and credited her treating physicians' observations.

However, despite this favorable evidence, both Dr. Hoenig and Dr. Friedman identified contrary evidence that cut against Avery's claimed disability. For example, Dr. Hoenig noted that "[t]he last neurological exam in the medical record is from February 6, 2013," and that "after her spinal cord stimulator (SCS), she has a normal neurological exam." A.R. 663. And Dr. Friedman observed that Dr. Nounou, one of Avery's treating physicians, had not recommended any specific restrictions after a July 2014 endovenous ablation procedure. Given this evidence, Dr. Hoenig and Dr. Friedman concluded that Avery was not disabled from performing any work, and those conclusions were reasonable.

*Calvert* is distinguishable. There we found that an insurance company acted arbitrarily and capriciously when it based its benefits determination on a "clearly inadequate" file review, because it, among other things, failed to identify the records reviewed, ignored favorable evidence, and reached conclusions that squarely contradicted objective evidence. 409 F.3d at 296. But here, both Dr. Hoenig and Dr. Friedman recited Avery's medical history in detail, specifically noted favorable evidence, and even credited Avery's treating physicians. Furthermore, neither doctor made any credibility findings. *See Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013) ("This court has found fault with file-only reviews in situations where the file reviewer concludes that the claimant is not credible without having actually examined him or her"). The file reviews at issue here were thus adequate.

As for Avery's assertion that Dr. Hoenig and Dr. Friedman were not provided appropriate records to review, Avery has not identified any post-termination medical records that exist, let alone records that support her claimed disability. The closest thing to medical evidence made available post-termination is Dr. Brengel's April 2015 letter, which Dr. Friedman reviewed. However, because Dr. Brengel's letter "did not include any new examination findings or results of

[EMG] testing," Dr. Friedman concluded that his position remained unchanged. A.R. 592–93. In sum, Sedgwick's reliance on independent record reviews did not render its final benefits determination arbitrary and capricious.

*The Social Security Administration's Disability Finding*

Finally, Avery argues that Sedgwick's decision was arbitrary and capricious because it did not address the fact that Avery successfully applied for Social Security disability benefits. "[I]f the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary or capricious." *Bennett v. Kemper Nat. Servs.*, 514 F.3d 547, 554 (6th Cir. 2008).

It is undisputed that Sedgwick required Avery to apply for Social Security benefits, and that Sedgwick benefited financially from reimbursement payments. It is also undisputed that Sedgwick neglected to reference Avery's Social Security award in either its initial denial of Avery's appeal or in its final determination upon re-review. Nevertheless, *Bennett* merely instructs "that a failure to take into account a Social Security disability award is to be *weighed* in favor of a finding that the decision was arbitrary and capricious, not that such a decision is arbitrary and capricious per se." *Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x 978, 986 (6th Cir. 2010). And it is not necessary for a plan administrator to "expressly distinguish a favorable SSA determination in denying disability benefits under the plan." *Leffew v. Ford Motor Co.*, 258 F. App'x 772, 779 (6th Cir. 2007).

Although Sedgwick's decision to terminate Avery's benefits, despite the SSA's earlier disability finding, weighs "slightly in [Avery]'s favor when it comes to evaluating whether that

decision was arbitrary and capricious," *Morris*, 399 F. App'x at 986, it is not enough to convince us that Sedgwick acted arbitrarily on the whole. For one, the SSA's disability determination was made two years prior to Sedgwick's decision to terminate Avery's benefits. *See Cox v. Standard Ins. Co.*, 585 F.3d 295, 303 (6th Cir. 2009). And at the time Sedgwick made its decision, it possessed additional medical evidence that the SSA did not, including the results of Dr. Shavell's independent medical examination, the plant medical physician's ability-to-work determination, and IRRs from Dr. Hoenig and Dr. Friedman. *See id.*

Moreover, the fact that Avery qualified for Social Security disability benefits does not necessarily mean that she should qualify for benefits under the Plan, because "a claim for benefits under an ERISA plan often turns on the interpretation of plan terms that differ from SSA criteria." *Whitaker v. Hartford Life and Acc. Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005). For instance, Sedgwick—unlike the SSA at the time of its decision—was not required to defer to the opinions of Avery's treating physicians. *See O'Bryan v. Consol Energy Inc.*, 477 F. App'x 306, 308 (6th Cir. 2012) (per curiam). We therefore conclude that Sedgwick's failure to address the SSA's disability determination did not render Sedgwick's decision arbitrary and capricious.

*Sedgwick's Decision Was Supported by Substantial Evidence*

Sedgwick terminated Avery's long-term disability benefits after deciding that she was no longer "totally disabled" under the meaning of the Plan. The district court concluded that substantial evidence supported Sedgwick's decision. We agree.

In reviewing the quality and quantity of the evidence in the administrative record, we have said that "substantial evidence" is "more than a mere scintilla." *McDonald*, 347 F.3d at 171 (citation omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). "The fact that the evidence might also support a

contrary conclusion is not sufficient to render the plan administrator's determination arbitrary and capricious." *Hurse v. Hartford Life & Accident Ins. Co.*, 77 F. App'x 310, 318 (6th Cir. 2003).

The administrative record in this case contained more than adequate evidence for Sedgwick to conclude that Avery was no longer totally disabled under the terms of the Plan. First, Dr. Shavell examined Avery in July 2014, and offered detailed observations that indicated "good range of motion," "no evidence of any loss of strength," and a generally "normal exam." A.R. 978. From these findings, Dr. Shavell concluded, "I do not see any evidence of a regional complex pain issue. . . . I do not find any physical evidence to substantiate at this point any disability whatsoever." A.R. 978–79. Next, Sedgwick required Avery to report to Chrysler's plant medical department for an ability-to-work determination. There, the plant medical physician observed, "[s]he is alert and oriented. . . . Right and left lower legs – no stasis dermatitis. Normal dorsalis pedis pulse. No pretibial edema. She walked without a limp." A.R. 946. On that basis, the plant medical department determined that Avery could return to work with no restrictions.

Sedgwick then referred Avery's claim to Dr. Hoenig for a file review. Dr. Hoenig reviewed Avery's extensive medical records and concluded that after Avery's "spinal cord stimulator (SCS), she ha[d] a normal neurological exam" and was "not disabled from performing any work as of 07/22/14." A.R. 663. Finally, Sedgwick initiated a voluntary re-review, referring Avery's claim to Dr. Friedman for another file review. Dr. Friedman reviewed Avery's medical records and concluded that there was "no sufficient clinical evidence to support any restrictions and limitations." A.R. 601.

To be sure, Avery's treating physicians repeatedly diagnosed Avery with Complex Regional Pain Syndrome and venous insufficiency. But even when "the evidence may be sufficient to support a finding of disability, if there is a reasonable explanation for the administrator's

decision denying benefits in light of the plan's provisions, then the decision is neither arbitrary nor capricious." *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010). And here, no fewer than four physicians concluded that Avery is no longer totally disabled. If this did not amount to "a reasonable explanation for the administrator's decision," it would be difficult to say what would. In conclusion, we find that substantial evidence supported Sedgwick's decision to terminate Avery's long-term disability benefits.

## III

For the foregoing reasons, the district court's judgment is affirmed.